It sounds that everybody is ready, and we'll now hear argument in Miller v. United States. Now I'm going to get it wrong, Mr. Sowers. Is that correct? Sowers, you got it right. Yes. Okay. Thank you. You may begin whenever you're ready. Thank you, Your Honors. Good morning, and may it please the Court. My name is Scott Sowers. I am with Ahling & Gilson, and I represent John Miller, who is the plaintiff and appellant in this matter. I'd like to request three minutes for rebuttal time, please. You'll have to keep track of your own time, and we may use some of it with questions, but we understand your request. Understood. The issue in front of the Court this morning is whether the discretionary function exception to the Federal Tort Claims Act applies where there are federal regulations and federal policies that specifically prescribe a course of conduct that government actors must follow before making a decision that is eventually challenged. And the Federal Tort Claims Act is a limited waiver of the United States' sovereign immunity from tort claims brought by individuals against federal employees who are acting within the scope of their duties of their employment. There are exceptions to the Federal Tort Claims Act, to that waiver of sovereign immunity. One exception to that waiver is the discretionary function exception, which basically says that if the government actor acts in a way that is using a choice or a judgment or acts in a manner in execution of a federal statute or in execution of a federal regulation or policy, then that act is not discretionary in nature. Excuse me, that act is discretionary in nature. I'm sorry, go ahead. Oh, okay. That clears it up. I take your argument to be that failure to follow a non-discretionary procedure in this case was the but-for cause of the termination, which otherwise might be a discretionary call, but that we have to go back to the underlying force or the underlying cause, which was allegedly failure to follow the procedure of passing this to an independent body to investigate fully. Exactly. That's correct. There are federal regulations on 0.25 CFR 12 and 12. various subsections that prescribe that all Indian tribes that are receiving federal funds to pay for their law enforcement departments, they have to implement and have minimum qualitative standards that at least match those expressed in the BIA law enforcement handbook. Is that handbook in the record? I mean, we have excerpts of it, but is the entire handbook in the record or just parts of it? I believe the relevant portions, Your Honor. It was somewhat extensive, and we did include in the record 4-48-01, 02, and so forth. Those are the specific handbook policies, federal policies that dictate how the tribal officers were to handle a complaint of misconduct brought against one of the tribal law enforcement officers. Can I ask you a question? Paragraph 50 of your complaint, you say that your request for an appeals committee cited to the BIA handbook to argue that the tribe failed to meet various procedural requirements, including reporting the allegation to the Professional Standards Division. You say cease Exhibit 11, which is attached, but Exhibit 11 doesn't say any of that. Is there some other document you're referring to where those points were raised in the request for an appeal? Interestingly, the BIA handbook was actually raised in the tribe's termination letter, or what the tribe called their appeals committee termination letter, which referred to the BIA handbook. I'll try to find the citation for that document. It was basically, I have it as ER-089, and that's the tribal appeals committee letter confirming the termination. They purported that they were confirming the termination based on the BIA handbook. In fact, the record shows that the tribe did not follow the BIA handbook, not even close. The heart of this issue is really that the tribe was required to pass along the complaint of alleged misconduct, which in this case came from the Nevada Department of Employment and Training and Rehabilitation, to pass that complaint upwards to the chief of police within the tribe, who then was required to convey the complaint to the Professional Standards Division of the BIA. Did you, during the administrative process, did you ever ask them to do that? That's what paragraph 50 says, and it cites Exhibit 11, but Exhibit 11 does not say that. I'm wondering if there's some other document or something else that you think communicates that request during the administrative process. As far as the administrative process, do you mean when Mr. Miller was challenging the termination? I'm just reading your own allegation that if you say that the request for an appeals committee raised this point, and you cite Exhibit 11, which is ER 91, and I'm looking at the document on ER 91, and it does not contain that request. I'm wondering if there's something else. ER 91, that's Mr. Miller's attempt to continue the appeal? Reno-Sparks Indian Colony appeals process, that's Exhibit 11 to the second amended complaint. And that was written by Mr. Miller? Yes, it's written by Mr. Miller, and it says that no administrative investigation was conducted by RSIC, which is Reno-Sparks Indian Colony, into my innocence, and therefore they have no evidence. But it doesn't, and it says the appeals committee should look further, but it never says, oh, you didn't notify the professional standards division as required by the BIA handbook or by the 25 CFR. Okay, I think I'm following your question now. And if that's the case, that may have been a mistake in how that was recited in the brief. It appears, based on what you just told me, that the ER 89 document was a communication from Mr. Miller to the tribe, essentially saying, I'm innocent. I would like to follow the appropriate administrative investigation process so I can defend myself. It sounds like what he did was he cited to the tribe's handbook, which, as an officer in that situation who's trying to defend himself, he may have immediately gone to the tribe's handbook. But that's not the critical part, what's at stake here. The critical part is that once Mr. Miller had communicated his innocence, and actually, most importantly, before the tribe had decided to terminate Mr. Miller, the tribe should have known that it was required by federal regulations and federal policies to report the alleged misconduct and then commence an administrative investigation. None of that was ever done. So whether Mr. Miller cited to the tribal handbook, that's not so relevant. The relevant part is the tribe failed to follow the prescribed conduct that the federal regulations and federal policies on point here mandated. Again, if the brief says that he referenced the BIA handbook, that appears to be a mistake, because it does appear that he referenced the tribal handbook instead. What I would like to point out is that, again, the heart of this issue is that the tribe went about receiving that alleged misconduct in entirely the wrong way. And if the tribe, the case law on point here dictates that the government actor shall follow the prescribed course of conduct, or in other words, the discretionary controlling federal regulations, statutes, and policies. And that did not happen here. Had the tribe done that, what they would have discovered, or what the professional standards division would have discovered when they commenced the investigation and started gathering facts, they would have quickly discovered that Dieter was actually mistaken, that Mr. Miller was the victim of a crime. He was the victim of identity theft. And that Dieter, very quickly after telling the tribe that Mr. Miller may have filed this false claim, very quickly communicated with the tribe that, hey, we actually think that this is fraud. We're investigating this. It turns out to be a big identity theft ring out of Florida who used Mr. Miller's name. So if the proper course of conduct had been taken, the tribe, or the PSD, rather, or the agent appointed to do the investigation would have quickly gathered the facts, would not have immediately terminated Mr. Miller, at most would have put him on administrative leave, and then would have begun the investigation, communicated with Mr. Miller about the status of the investigation, communicated with Dieter about the facts of the alleged misconduct, and would have quickly learned that this is a mistake and this officer should not be terminated. None of that happened. Instead, the tribe, within about 10 days of receiving the allegation of misconduct, told Mr. Miller that he was fired. Mr. Miller then did his best to try to invoke his rights, to try to ask for an investigation to prove his innocence. None of that happened, and we end up with a result where the tribe's law enforcement agency, whose goal is to provide quality law enforcement services for officers, and as part of that goal is to determine whether alleged misconduct by officers is confirmed or not, those goals were entirely thrown out the window. And we end up with an officer whose reputation is very damaged, and who was terminated essentially for being the victim of a crime. And with that, I would like to reserve my remaining time if there are no other questions right now. I believe there are not at the moment, so you may reserve, and Ms. Vance, we'll hear from you. Wait, wait, there's no sound. Start over. I'm sorry. No, you're fine now. I think you can turn down the central. I thought it was okay. May it please the court, Your Honor, good morning. Your Honors, good morning. Holly Vance on behalf of the United States. Your Honors, the discretionary function exception is commonly invoked in employment cases under the FTCA. Here, no federal provision prescribed the circumstances for a discharge by the tribe. Now, counsel has asked that you consider these CFRs for the first time on appeal, claiming that they present purely legal issues and that there are no disputes of fact, but actually there are some issues of fact with regard to the application of those provisions, which I'd like to highlight for you. First of all, I think there's been... I mean, the complaint cites the 12.53 requirement to notify the PSD, doesn't it? So that was raised below, wasn't it? I believe that's in the complaint, yes. Now, what about, how do you deal with the Vickers case? Because the Vickers case seems to suggest that a claim based on a mandatory duty to report to higher-ups who were supposed to conduct an investigation is outside the discretionary function exception. So how do you deal with Vickers? Well, I ask that you keep in mind that the discretionary function exception is very broad and all-encompassing. The Vickers case does say that a challenged decision need not actually be grounded in policy considerations so long as it is by its nature susceptible to policy analysis. And what that means is... Counsel, I think you're maybe... Maybe I have a different question than Judge Collins, but if there is a mandatory procedure that has to come before a termination decision is made, and the mandatory procedure is not followed, I don't understand how you can then say, well, it isn't really mandatory because the end result turns out to have discretion. Let's say it's something simple like you cannot be fired except for commission of a crime without getting three warnings in advance, and you got no warnings. And it was being late. You didn't commit a crime. Is it your position that notwithstanding a mandatory regulation, the ultimate decision is shielded even though mandatory procedures were not followed? Well, here, Your Honor, the crux of his claims are wrongful termination. The focus is on the discharge. Well, of course it does because that's what the ultimate result was. That's why I'm asking the question. And these procedures are not mandatory. I mean, I think that's the other point I want to make. And the FTCA does not provide for a claim for violation of procedures. I mean, here... No, but the ultimate termination decision, assuming that we would hold as other circuits have that it is a discretionary function, it seems to me that if that ultimate discretion is exercised without going through required processes, you never get to it. It seems to me outside the exercise of discretion because the thing that wasn't done wasn't discretionary. Now, I understand you're saying it actually wasn't mandatory. That's a different issue. Right, and if I could expound on that, Your Honor. There is no federally mandated procedure here. Take a look at, for example, 25 CFR 12.14. He has relied heavily on that in the briefing, and that appears to apply only to law enforcement functions, not a personnel action. I don't think it's applicable. And then these other CFR provisions reference, for instance, they state that the CFRs are mandatory, but they don't speak to the handbook provision as being mandatory. And the CFRs never state anywhere, even if they were to apply here, they never state that the handbook is mandatory. Well, let's look at the language of 12.53. It says, any person having knowledge of officer misconduct must report that information to the office's supervisor. The supervisor must immediately report allegations to the Internal Affairs Unit, which is a reference to the BIA's Internal Affairs Unit. Is that applicable here, and was that done here? Well, I think without additional information, you can't ascertain whether it is applicable here. Based on the allegations of the complaint, which we have to take as true, it is applicable here. This is a program that receives funding through the BIA, and under the regulation, programs that receive funding through the BIA have to report, in the language I just read to you, when there are allegations of officer misconduct. Am I reading this wrong? No, Your Honor, but if you look to the handbook, the handbook leaves the ultimate... I'm not talking about the handbook. I'm talking about the obligation in the CFR to report to BIA Internal Affairs. That exists apart from anything in the handbook. Am I reading this wrong in terms of saying that that was an obligation that applied here? Well, let me back up, Your Honor. He's asked that you consider these CFRs, and I think you can't meaningfully assess them because it's unclear whether we're talking about the same handbook. For instance, if you take a look at CFR 12.14, it references the BIA manual. It references a law enforcement handbook. I don't know if that reference to the law enforcement handbook is the same as the handbook that is referenced in the complaint because that has a different title. I don't think you're answering my question. I'm going to ask it one more time, and maybe you can answer it. Tell me whether or not 12.53 applied here. Based on allegations in the complaint, he alleges that it applies. Tell me whether he's reading the regulation wrong. I don't think it applies because it's unclear whether we're talking about the same handbook. Why doesn't it apply? Because it says it doesn't apply. Because the second amended complaint refers to a handbook that has a different title than that one, so I'm not sure if it even applies. How could a handbook override federal regulation? Well, it can't. Even if the handbook doesn't say what the regulation says, so what? I don't understand why the handbook is even relevant to answering Judge Collins' question. Well, Your Honor, my position is neither the handbook nor the CFRs are relevant to discussion. The application of discretionary function focuses on, number one, do they have discretion to implement the adverse employment action here to terminate? And then if they do have discretion with regard to that issue, then you move to the second prong, is it susceptible to policy analysis? The decision to terminate is susceptible to policy analysis. I have a question about that also. Let's assume away the procedural requirements for the sake of this question. There's no procedural requirements. There's just discretionary function termination. If someone is terminated because of a demonstrable lie, is that protected by this discretionary function exception? And I'll give you a clearer example in case you don't agree that this is the situation here. Let's say some disgruntled ex-spouse simply makes up something and reports that their spouse who's employed has robbed a bank and isn't fit to be employed anymore. Can that just result in a firing even if it's absolutely 100% false and be protected? The discretionary function exception is very broad and all-encompassing. And we know that because it applies regardless of an employer's subjective intent. It applies whether or not the discretion is abused.  So you're saying yes to my, you can do that and be protected because it's discretionary. If a litigant elects to pursue a retaliation or discrimination claim, Mr. Sowers, I believe, has dropped. I'm calling him now to get him back on the line. Let's hold the clock, too, if you can stop the clock. Thank you. We're off live stream. I'm just making a call now. Thank you. It looks like we've got him back. You're back. We can't hear you. We still can't hear you. Kwame? Now we hear you. Okay. You can still hear me? Yes. Okay. I apologize. I lost you at about five minutes, and Judge Graber was asking the question of if somebody were terminated for a demonstrably false accusation. Okay. Ms. Vance, we'll let you go a little bit over because I want you to go ahead and repeat your response so that Mr. Sowers has an opportunity to rebut if he wishes to later. Thank you. Here's my response, Your Honor. If a litigant elects to pursue a retaliation or discrimination claim via the FTCA, he faces this huge jurisdictional hurdle that is very broad and doesn't look behind the curtain at the nitty-gritty of the allegations alleged. Instead, the focus is the nature of the conduct, the termination, the nature of the action. So is it your position that no matter the reason and no matter the evidence about that reason, any decision to terminate is insulated, period, with no exceptions? What about this policy question? No, it is not insulated. I'm just trying to focus on the correct analysis. To overcome this very broad discretionary function exemption, you have got to find a federal provision that requires a different result. You don't focus on the nature of the allegations because that's what the case law tells us. We're not going to second-guess a government decision. We're going to focus on the nature of the action taken. We're not going to look behind the curtain and see the nitty-gritty of the case. Something I'd like you to consider as I give you the government's approach on this, if otherwise you're going to have a mini-trial in every employment case at the jurisdictional level because the allegation here, wrongful termination, I mean every employment case is alleging bad faith and inappropriate conduct. But I don't think Congress intended at this gatekeeping role or function or level that you get into a mini-trial on the merits. So I respectfully disagree with focusing on the specifics of the allegation. Instead, you focus on the nature of the employer's action, which is here. The decision to terminate, is that susceptible? Let me ask you a question here, sort of a follow-up on what Judge Graber just asked. So if I understand your position, no matter what the claim is by the fired employee, they just simply have no remedy. So even if the tribe had fired him solely because he was a white man or solely because of his sexual orientation, tough luck. Is that your position, there's no remedy for him at all? No, that is not my position. Keep in mind, this is a very narrow area. So Mr. Miller is deemed to be a federal employee for an FTCA claim only. As far as non-FTCA claims, he would be considered to be a tribal member who would have the opportunity to take advantage of whatever remedies are available there. And here, curiously, if you look at his appeal to the appeals committee, he didn't raise this retaliation issue. Take a look at Excerpt of Record 91. There he says, no administration investigation was conducted. He doesn't say I was terminated because of reporting harassment and discrimination. So no, Your Honor, I do not believe litigants are losing all remedies under this scenario. You have to keep in mind this is a very unique, narrow context. All right, but you're saying, I gather, he loses all federal remedies. Is that what you're saying? Well, you know, I don't know because I don't know what remedies he would have with the tribe because I don't represent them. So no, I can't say that, Your Honor. But what I can tell you is this is a very narrow foreclosure of a remedy. And I would like to address real briefly, if I may, this argument counsel makes about the respondeat superior. The government's position on that is if you look at the papers that were filed throughout the nearly two years of litigation, he never opposed our motion to dismiss by asserting, hey, United States, you missed one of our arguments. So I think it's real clear that it's as I've argued, it was an underlying theory to the claims and not a claim, a standalone claim by itself, Your Honor. And I'd like you to take a look at the district court's decision. I think the district court hit the nail on the head when she said, Mr. Miller has not pointed to any federal authority indicating that the tribe did not retain full discretion over the ultimate decision of whether to fire him. That is, I think, the dispositive analysis here. There is no federal provision that required a different result here. And for that reason, I'd ask that you affirm. Thank you. Thank you, counsel. Mr. Sowers, you have some rebuttal time remaining. Thank you. The BIA contract in which the tribe had entered to receive the federal funding expressly states that tribal law enforcement officers are federal employees for Federal Tort Claims Act purposes. Therefore, Mr. Miller had a claim under the Federal Tort Claims Act as a law enforcement officer of the tribe. The government has raised the defense, and the case was dismissed on the grounds of discretionary function exception. As we've already discussed, the first prong to that is whether there are any mandatory procedures that the tribe had to follow. And to rebut the last point made by opposing counsel there, according to the BIA law enforcement handbook, the final authority with whether to discipline or terminate Mr. Miller rests with the Professional Standards Division of the BIA. That is all part of this because when the United States exposes itself to liability under the Federal Tort Claims Act pursuant to this BIA contract, the United States understands we need to have some policies in place to make sure that we limit our risk on what might happen in the field with officers or alleged misconduct against officers. That's why the CFR 12.53, as Judge Collins pointed out, says that the supervisors and the chief of police must refer the alleged misconduct up to the PSD. The BIA law enforcement handbook, opposing counsel says she's not sure, which is in the record starting at ER 121. She says she's not sure if this is the handbook that the CFR relates to. It expressly states within it, it expressly references the CFR. It says that this law enforcement handbook was created to address the concerns or the mandates explained in the CFR. So this is the correct handbook. With regards to the case law that is on point, it's very clear. Discretionary function exception does not apply where there is a federal regulation or policy on point. It doesn't matter if it's a termination of an employee. If the government actor was required to follow a course of conduct, they cannot reach that termination until or unless they follow that conduct. I'm out of time. I will address the second prong if your honors would like. Very briefly, just 30 seconds or so. Sure. Regarding whether the challenge to action is one that is in furtherance of the agency's goals and objectives, it cannot be said that a bad faith act or an intentional bad faith act, such as the hypothetical of a termination for a demonstrably false lie, that cannot be said to be in furtherance of a legitimate social, political, or economic policy that has been put in place by a federal agency. It doesn't make sense that way. The concept with the second prong is to make sure that the government is not held liable when it's taking actions that are subject to political and policy analysis, and that may be in furtherance of the agency's goals and objectives. Hello? You've frozen. We are having IT problems. We've lost him. I will give him a call. Stop the clock and get him back if you could, Kwame. Calling him now, Judge. I think we're almost to the end, but not quite. Okay. Judge, do you want me to put a minute on the clock for him? No. I'll ask him to sum up when he comes back. Okay. I guess this remote stuff is very good, but not perfect. Well, it isn't perfect, but neither are we. Don't admit that. Judges never make mistakes. Tell that to the Supreme Court. We get reversed. Judges, I've contacted the tech. There it is, office. He's going to go and give Mr. Sowers a hand. Okay. Thanks, Kwame. You know, it's somewhat comforting.  Okay. Mr. Sowers, you're back. Yes. Again, I apologize. Well, it's okay, but I think you're at the point where we'd appreciate your quickly summing up your final point. Very well. Again, the second prong of the discretionary function exception test is to determine, assuming that there are no federal regulations on point, is to determine whether the conduct was the type that the government should be shielded from judicial second-guessing. And where the conduct is clear bad faith or is an intentionally bad faith act, that's just not the type of conduct that really can legitimately be in furtherance of a policy objective from any federal agency. So my argument is the government has failed to meet the first prong of the discretionary function exception and also failed to meet the second prong. Thank you. The case just argued is submitted. We appreciate very much the arguments from both counsel.
judges: Gilman, Graber, Collins